Andrew Eichner, Berger Schatz, on behalf of the Appellant. With me at council table is Myra Futris, also from my firm. Good morning, Judge. Enrico J. Mirabelli, Biermann, Pritikin, Mirabelli, and Sverdlov. Along with me is Amy Gianitis. We represent the appellee, Mickey Mancini. Well, as you know, we're pretty liberal, so the same formal time. But if we ask a lot of questions, we'll give you leeway. So with that, you fire away. I would just like to reserve some time in rebuttal. Fine. May it please the court. As I said, my name is Andrew Eichner. I represent Nicholas Gansner, the appellant here. Your honors, the name of the child at issue in this dispute is William Gansner. And that's his father right there, Nicholas Gansner, in the first row in the dark suit. His father's name is William Gansner. It is not coincidental that his father's name is the same name as the child at issue in dispute here. It is not coincidental, your honors, that on the birth certificate of the child before the parties were even married, that the name of the child is Gansner, the last name is Gansner. It is not coincidental, your honors, that prior to the even marriage of the parties, in a church, the parties swore before God that at the child's baptism, when they were each holding the child, that Nicholas Gansner was the father of this child. These parties have affirmed and swore before the state of Illinois, the state of Wisconsin, and equally, if not more important, before God, that this man is the father of William Gansner. All right, but that's not reality. Let's get to the issues. OK. All right. What I'm asking this court, your honor, to affirm, to ratify that affirmation, I think this court has the legal authority to do so. But we question we have any authority to do that. This court has? You may want to get to the case law. Your honor, the case law provides you what we claim is four bases for finding Nicholas Gansner to be the parent of this child, the father of this child. First, this court, and I put it last in my brief, but it's not a throwaway argument, as sometimes last arguments are, is the doctrine of parent's patriae, which is a jurisdictional underpinning of the entire Illinois Marriage and Dissolution of Marriage Act. Under the doctrine of parent's patriae, the court, and this court, and any court, can act in an emergency situation or exceptional circumstances arise to protect the welfare of a child. All the children that are in this court system are wards of the court. And this court has, the trial court, this court has the inherent authority to protect this child, not just from current harm, but potential harm. And the potential emotional, psychological, physical harm to these children, William and Henry, William's brother, and Nicholas's child, who is not in dispute, is self-evidently at risk. If the public policy of the state of Illinois has any import, if the father-child relationship is destroyed, if he does not have a father. What about counsel's argument as to the footnote in the Mikulovic case, which says, basically, that parents, as you're arguing, is considered extraordinary and is not intended as the basis of jurisdiction for general custody disputes between parents and others? This is not a general custody dispute, Your Honor. That the parents patriae document has been used in a variety of contexts to afford a court jurisdiction under these circumstances. This is an exceptional circumstance, an extraordinary circumstance. This is the death of a relationship, whether we're going to revive it, resurrect it, preserve it, or kill it. And that, to me, Your Honor, I cannot can think of no more extraordinary circumstance for the plenary power of this court to be exercised under these circumstances. Let me ask you a question. Let's just say that we agreed with you and gave you this. Then the case goes back, and there's an attempt at an adoption. And a trial court, what trial court is going to grant that when the other party is going to object? I'm not asking for this court to return it to the trial court for an adoption. I'm asking this court to find that my client, under a variety of equitable principles, has standing sufficient to seek, not to get, but to seek custody or visitation with his child. That's all I'm asking for. And I understand that the superior rights doctrine, you may ask me, is implicated in that. But that is something that the court reaches after the custody dispute or visitation dispute becomes right. Well, I would find it difficult that the appellate court would consider that. Consider? Acting on its own. This would normally be remanded. The question of standing is de novo as a matter of law. I understand that, but there are certain things that the appellate court does not do. I understand that, Your Honor, but I believe this court, as an appellate court, can reverse the trial court's decision on the issue of standing. It's a de novo issue. Then, that's all the court is. The court is determining nothing in terms of custody, visitation, when or whether the father can see the child. That would be for the trial court to determine on a best interest standard, which is what the overwhelming issue is before the courts when children are concerned. The court can return this case to the trial court, if you want, for a hearing on standing, because there was never a hearing on standing. It was done on the briefs and affidavits. But we believe that this court, under its appellate power, has the authority to reverse on a de novo basis and find that, under the law, just like the court did in the Zwerin case, that a person had standing to seek visitation with his child when he had been defrauded into believing that the child was his. That's the Zwerin case cited in both briefs. It's a 1995 decision of this case. The court also has the authority, in addition to the parent's patriae, under the doctrine of equitable estoppel to prevent Mickey from asserting a position that she should be stopped from asserting, i.e., in this case, that my client does not have standing, is not the father of the child. All the classic elements of equitable estoppel have been met in this case. There was an intentional statement that was not true, upon which my client relied, to his detriment. The specific statement, Judge, and I'm glad you asked, is that you are the father of this child. That was not a true statement when she made it. As you can see, when she filed her petition, she claimed he wasn't the father. That status of fatherhood, as anybody who is a parent, a father, a mother, is not something that's transitory, that's immutable. You're the father. It's not dependent on whether you remain married or not. In every single conceivable aspect of their lives, that was the representation he made, and he relied on it, Judge, by investing not just his money, but his heart and soul as a parent, from literally the second this child was born, till he was taken away from him by the mother, to quote, incentivize him, end quote, in the context of this divorce. And that was the fraudulent statement upon which he relied, to his detriment, and for which there is injury. Isn't the term father often used in the context of stepfather as well, but does that ignore that individual with any rights under the law? A stepfather is different from a father. That is true, but that was not the representation made. The representation made was, you are the father. You are the dad, repeatedly. That is a immutable concept. That is not something subject to the whim of a party, of a person to change. If you die, you're the father of the child. If the child dies, you're the father of the child. That doesn't change when you file for divorce. And that, your honors, was the representation she made to him. And that representation he relied on. Counsel. I'm sorry if I'm not. The whole time that this relationship was happy, Nicholas knew that he had not adopted the child, and that he was not the child's biological father. Right, he could never be the biological father. Nor was she the biological mother. Right. But he also knew that he had not adopted the child. Correct, your honor. So how is this a detrimental reliance on what she was saying, when he knew he's a lawyer, and he knew the two things that would have created fatherhood, biological fatherhood or adoptive fatherhood, didn't exist? The representation that he was a father, that he was a father of this child, was not a conditional representation that she made, as long as you file the adoption papers. The representation was, you are the father. It wasn't comma, unless and until you file the adoption papers, or finish that ministerial step. And so the representation was unequivocal, inviolate, non-conditional, you are the father. If she had told him, I'll consider you the father during the marriage, but if we get divorced, and we haven't taken that ministerial step of literally just filing some papers, you won't be the father, then he couldn't have relied on it. But that's not what she said. That's not what every single word and action and deed she did from them, before the child was born, to the date she filed, and even after, when he was served with the petition saying he wasn't the father, after they left a parent-teacher conference, where he's listed as the father of this child, every single word and deed said, you are the father, period. Can't there be a distinction between being a father in a practical sense, and being a father in a legal sense? Well, I would say that if you are the father of a child, there can be, but in this case, he was, for all intents and purposes, the father. Not the legal father, not the practical father, the father. You can be a friend, you can be a stepdad, you can be a third party who comes in and helps out every once in a while, and call me pop, but he was the father. And under Illinois law, under other jurisdictions law, the court recognizes this parent, this life force, this relationship as the father. He was practically the father. There's no other word in the English language to describe his relationship with this child other than father. And I defy anyone to come up with it. He wasn't a stepfather, he wasn't a friend. The IMDA doesn't define parent, but the Parentage Act does. And it calls it the legal relationship between a child and the natural or adoptive parent. Why should we expand that definition to the guy who's living with the mother? First of all, Your Honor, you're right. And I'm glad you asked. The parent is not defined in the Illinois Marriage and Dissolution of Marriage Act, and as counsel aptly points out in their brief opposing counsel, it should be given its normal and customary meaning in a statute where it's not defined. And if there is no other natural and customary, if a million people looked at their relationship, they would say parent, father, child. So use their language. Make it the natural, ordinary meaning. And to the extent of expanding it, why are you expanding it, Judge? Well, first of all, you're using appropriate, inexistent legal theories to allow this person and this child, who has nobody here speaking for him, to have a father. And I don't think you can limit it to this case. You can limit the facts to this case, as many of the cases around the country does because they're unique. This state has been in existence since 1818, and that's almost 200 years. It's the first time this case of this nature has come up, and it may be the last time. But the public policy of the state mandates that you do. I believe unequivocally to not do that in this case is directly contrary to public policy, and I don't think this court will do that. Particularly, Your Honor, particularly where there's not one and one fact, one fact, which would militate against doing that, not compelling or otherwise. This was only done to incentivize him. She admits he's a good enough parent to have joint custody of Henry. There is not one fact that she says in her brief, and I dare, I defy anyone to point it out, why he shouldn't be the father other than she can assert that. Why? So why would you not do something that is totally consistent with the best interests of the children, consistent with every policy in the state of Illinois for no particular reason other than you can? Just makes no sense. And there's a child here. We keep talking the abstract. We have all these people. There's a three-year-old and his brother, Henry. His brother, Henry, who every day visits with Nicholas, and William is behind a glass cage looking at him, seeing him, but can't go with him. And if you don't think that when William and Henry get older and talk, who are you going with? And if you don't think that there is going to be emotional harm to those two children, when William says, who's that? That used to be your dad. Who's that? Who's William Ganser? That's your grandfather. If you don't think you're just, you're destroying. The conduct of the mother here is senseless. It's not even in her own best interest to guarantee emotional harm to her children. He's sending support checks that are turned away. We have our entire nation, Judge, our entire state system, Department of Family Services, DSS, support, ERISA, public aid, is all designed to foster and prevent, foster the type of relationship my client had with his child, and to prevent what she's, what Nikki is asking you to do. Take it away. And for what? When you have methods to do it, is what I'm saying. My understanding. I apologize, Your Honor. Actually, it's my understanding that Nikki is asking us to determine whether or not Nicholas has standing. Correct. And the effect of that is that if you affirm the trial court's decision, you have rendered William fatherless. You have destroyed the relation, you have terminated by judicial, that which she has begun the termination of, a parent-child relationship in the normal, ordinary course. And I don't mean to, it's not a guilt trip, but that's going to be the net result of it, Judge. And I ask each of your honors, when you reflect on this, to what end? To what end? Because I don't know the end. If it was to incentivize a divorce, is that appropriate to terminate a parent-child relationship? I think one case that TB versus LRM, as cited in our brief, discusses just this entire point, when it was talking about partners, not a married couple, but it's equally apt. It says that a biological parent's rights do not extend to erasing a relationship between her partner and her child, which she voluntarily created and actively fostered, simply because, after the party's separation, she regretted having done so. This child needs somebody to speak for that child. You cannot allow this woman to erase that relationship for no reason when every policy of the state mandates otherwise. You have the tools available to you, Equitable Estopital, the Zwerin case. You can revisit the Equitable Parent Doctrine, Parents Patriae, Equitable Adoption. Every case that deals with this issue across the country that are very hard to reconcile legally. We hear about Superior Law Doctrine, and Family Doctrine, and Equitable Estopital. But the one unifying concept of every case that touches on this issue is that the court protects the best interests of the child. And in this case, Judge, there is no other decision other than to allow him to seek custody or visitation of his child that is consistent with the best interests of the children. Otherwise, the entire public policy of the state of Illinois, I'm reading it wrong. You speak to the issue of equity. Yet, your client delayed and was dilatory in taking any action to file a petition to formalize an adoption, or to initiate an adoption, for that matter. Now, how do you reconcile that with the maxim that equity protects the vigilant and not those who slumber on their rights? Well, equity also regards that which is done as done. And what's been done? No petition's been filed. The entire Holmes study had been done. As a step-parent, the petition, all the documents were ready. They moved from Wisconsin to Illinois. He was raising three young children. And he didn't take that last ministerial step. That last just, there was not a discretionary issue involved. And on that narrow, hyper-technical hinge that we're going to take away a parent-child relationship, a father from his child who's raised every minute of every day for the time they were together, he was there. It wasn't even a case of him being out of town, or drunk, or sexual abuse. He was a great father in our own letters and documents. So yes, he didn't do that. And he regrets that as more. He's cried in my office dozens of times about that, Judge. But are we going to let that stand in the way when we have substantial compliance under contract cases that you can have a breach of contract or not, when you don't deliver all the widgets? And the case is cited. We have situations where the law bends a little, changes the definition, allows somebody to do something to do right, to do equity. This court can, what's done is done. He did every single thing except that last ministerial step. If his car had broken down on the way up to Wisconsin and she filed for divorce in the interim, there's no difference. He just didn't do that last step. And you know why he didn't do that last step, Judge? And equity, another equitable maxim is to assert that you have to have clean hands. He relied on her that that relation, that inviolate, non-mutable father-child relationship would survive the divorce and would survive his failure to take that ministerial step. If that had not been the representation, he would have, that wouldn't have happened. So you can't rely on an equitable maxim in that regard when you have told somebody something that subsequently is not true. Your client's a lawyer? My client is a lawyer, Your Honor. Your client and Mickey were married in May of 09? Correct, Your Honor. So from May of 09 until September of 2010, he could have filed the petition and just didn't? He could have filed the petition and didn't. And you're right, Your Honor. And the issue that Your Honors have to ask yourself is, in light of all the equitable principles I've stated, in light of what's, are we going to punish William and Henry for his failure to take that ministerial step when he believed he never had to take it? Are we good? Because that's the people who are hurting here. Nicholas is an adult, OK? Maybe. He's hurting very badly. But William and Henry, a three and two-year-old, now almost a four and three-year-old, are the ones that are being hurt. Now, are we going to punish them for that? Are we going to reward the mother for telling him that your relationship is immutable? Those are the questions you face. They're not easy questions, Judge. I don't have an answer. I thought that at one point, Mickey actually said to Nick, get with it. She did say that, absolutely, Judge. And he still didn't do it. He was, you're right. But again, she didn't say, do that, or else if we file for divorce, you won't be the parent. She said, you are the father. You are the father. You are the father. She didn't condition it. It wasn't a comma with a condition subsequent to it. Anything else, counsel, that you want to add? I just feel, Your Honor, that we have a situation here where you have three or four paths that you can take. The one path, which is the one that most courts take on the standing, will destroy a relationship, will be contrary to the public policy of the state of Illinois. You have three or four other paths that other courts have taken, that your honors have taken, that the law of Illinois provides you to do something, that the overwhelming public policy of best interest of the child mandates you do. To do otherwise would be one of the few decisions of this court that would be a decision that would be not consistent with the best interests, not of just of William, but of Henry. And your honors, there are no cases in Illinois on this situation. This is a unique situation. And if it opens the floodgates, and they're going to say it's going to open the floodgates, if it opens the floodgates and there are more cases, or even a few cases, where a loving, supporting, caring person who is a husband of a wife and has been a father and a parent to a child is willing to give his heart, his soul, his life for the child, then let the floodgates open. Illinois, the United States, needs more fathers to be invested in their children and care about them, like Nicholas. Thank you, counsel. Thank you. May it please the court. Good morning. In preparing for this argument, I realized I could make my entire argument in five lines. But I think the court might expect more. I know my client does. Mr. Ganser had but one option, and that was adoption. And he never exercised it. Mr. Eichner, my esteemed opposing counsel, says again and does again what he's been doing throughout the entire case. And I've said it in my brief, and I say it again. Enough is enough. He starts the argument and turns to his left and points to a gentleman and said, he is the father. I don't care how many times he says it, it doesn't make it true. There's a difference between rhetoric and reality. This matter comes before you because a lawyer, Mr. Ganser, and his lawyer, Mr. Eichner, filed two pleadings, verified, certified under Rule 137, in which they say Nicholas is the father of William. That is not normally how it is done. You normally say that as a result of the marriage, there were two children born to the parties, that a child was adopted, and so on and so forth. It doesn't say that. He just says, I am the father. Nicholas, in his brief, and I mentioned this before, and today, takes the position he's some kind of victim. If he's a victim at all, he's a victim of his own inaction. He's a victim of his failure to do something. Justice Puchinsky, I believe you nailed it. In all of those months that he was married and the adoption could take place, he didn't do it. And he said, in his brief at page 11, life and parenthood got in the way. I don't know, but I think children are your life. And if children are your life, then they don't get in the way. And he says, in the way of administratively finalizing this act, to trivialize the entire adoption act to some administrative procedure is wrong. And I've argued this in my brief, and I don't want to keep arguing what I've said in my brief. But I stand, I listen to Mr. Eichner say to you, don't punish the children. How are you punishing the children? Let's decide, let's do what every court in America does. Let's talk about the best interest. I would love to talk about the best interest when it's appropriate. The issue is standing. You can't put the cart before the horse. They said it makes for bad law and worse transportation. You cannot do what they're asking you to do with all due respect, because what they're asking you to do is to put it on you and say, don't punish the child. Every human, whether you have your own children or not, feels for children. We all want the best for children. They're our future. But this isn't how you go about it. And if there's anyone to blame, it is not Mickey. It is not Judge Katz. It's not Rico Mirabelli. It's William Gansner. He is the one who did not follow through. The continuing attempt to blame someone else for his inaction, with all due respect, has to stop here, and it has to stop now. The court system was not created to protect people from themselves. Mr. Gansner, and only Mr. Gansner, is the one to blame. And as I listened to the argument about how this is unique, that these set of facts are extraordinary. They're not unique. They're not extraordinary. He talks about, and he mentioned today something that I've never heard, about how this was a contract. And if you just don't get all the widgets. And I thought to myself, he never pled there was a contract. He never pled it in his brief. Sometimes there's a thing in Illinois called, a contract to marry. If you promise to marry me, and you don't marry me, I'm going to sue you. It's called the Illinois Breach of Promise to Marry Act. There's a statute right on point. While it's disfavored in the law, there's a statute. There is no such statute, you promised to let me adopt a child, and then you didn't, which would bring you maybe in the contract realm. So for counsel just to keep, pardon the expression, spitballing as he gets up here, and throwing up everything he can possibly think about, that's not even in his brief, I find offensive and insulting. Phrases like life got in the way, again, going back to that. Life just doesn't get in the way. I don't think there's anything more important than your child. Complete the adoption. Again, repeating only for the sake of emphasis, comments that are in his brief, and I put them in my brief, and I cited the page numbers, that the adoption was an administrative act. It was a mere technicality. In fact, it was more than a mere technicality. It was a hyper-technicality. Mickey, armed with nothing more than the hyper-technicalities of the law, if we are not a people of laws, if we are not a state of laws, we are a state of chaos. I can appreciate trying to be creative on behalf of your client. But I do not believe in filing petitions, and language, and arguments that are nothing less than sanctionable. There are only two indisputable facts in this case. You are not the biological father, Mr. Ganser. You did not adopt a child, Mr. Ganser. You have no standing. And just because you say it, does it make it so? Again, reality versus Hollywood. A long, long time ago, in a galaxy far, far away, was the beginning of a series of movies. And in one scene, between good and evil, Darth Vader says to Luke, I am your father. And everybody, ooh. Nobody did a DNA test. Nobody said, did you adopt him? Nobody questioned Darth Vader. Why? Because it's Hollywood. It's not reality. But in Illinois, when you're talking about reality, you have to adopt the child or be the biological father. And you need to say that in an initial petition. And they didn't say it. They said it as a conclusion. And Judge Katz rightfully struck it. What about his statement that there's a misrepresentation by what they evidently, on several occasions, specifically stated? Justice, I represent a guy named Bob Vorman. If he sold you a car and he said, Justice Smith, I have this beautiful blue Chevy for you. But it's a white Chevy. Can you sue him? No, because no reasonable person would rely upon the color of the car. What I'm telling you, if you could look at the car, he knew he wasn't the father. He knew he had to do the adoption. He wrote a series of emails, I'm going to get to the adoption. Mickey said, you've got to do the adoption. I don't care if she stands on the top of the John Hancock building and screams out, you're the father. That doesn't make him the father. The only way he becomes the father is by operation of law. Mickey has no right to confer fatherhood upon him unless she agrees to an adoption. But it's the court who's making him the father. If he is the biological father, it's the law that makes him the father. Mickey doesn't have that power. And as I said in my brief, one of the problems when we get to the issue of the law, because I think Justice Sterber, you said, someone said, let's get to the case law. Illinois doesn't represent equitable parents. The Roberts case is right on point. Nothing has changed the Roberts case. So to the extent that he wants to argue the law, he has no law. And he said, well, this is a case of first impression. It's a case of first impression because they made it that way because he never did anything to complete the adoption. It's almost mystifying that he comes before the court and says this. In this case, he argues in getting to your answer, no matter what she says. This is a University of Virginia Law School graduate. I'm not holding to a higher standard because he's a lawyer. But when we talk about a reasonable man's standard and reasonable reliance, it's a factor to be considered. I was reading, preparing today, and in the attachments is that home study evaluation that they refer to. And I noticed, unfortunately for the first time, but it's in the record, that Nicholas's aunt did an adoption. And he was talking about how he's familiar with the adoption process because he's the godfather to an adopted child. Well, if you're the godfather to an adopted child, then you know you have to adopt him. He writes an answer. And you think, I know I just have to fill out the petition. As I said, if these are hyper technicalities, then why did I go to law school? Why didn't I just tell everybody I'm a lawyer? I don't know why I got a marriage certificate. I just, bell, we're married. Good enough. It's not the way it works. It creates chaos. You render the entire Illinois Adoption Act useless. Why do we have it? There's a statutory scheme for these things to operate within the law. These things meaning processes to adopt a child, to get married, to have a law license. I don't know for a fact, but I'm going to presume that each one of you justices may be a homeowner in the county of Cook. If you buy a house, you know you have to pay real estate taxes. If you don't pay your taxes, they're going to be sold at a scavenger sale. If you don't redeem your taxes, you're going to lose your house. And when someone comes to you and knocks on the door and says, time to move out. We bought your house through a tax sale. And you say, but wait a minute. This is the Clark house. It's from 1850. It's the oldest house in Chicago. It's the most unique house in Chicago. It's been in my family for six generations. We named the Clark house after each generation. What can you do for the man? He didn't pay his taxes. He didn't file the petition. He knew he had to do it. He talks about equitable estoppel. Just Judge Katz said, and I said in my brief, there are no secrets here. You knew what you had to do. You were involved with the adoption agency. You knew you had to adopt. Mickey said, Mickey never said, don't adopt a child. Ah, that whole adoption thing is overrated. Don't worry about it, Nicholas. You don't have to adopt anybody. He's not a lawyer. She said, could you please do this ASAP? And he writes an email, OK, I'm going to, good, great. I'm going to get on this. But he never does. And he creates the problem. And he now says to all of you, solve this for me. But you see, we don't live in Nicholas's world. If you want to solve Nicholas's problem, you create chaos for everybody else. I said in my brief, when did he equitably adopt the child? I wrote that. When they wrote their reply, they got me. They actually, in parentheses on a certain page, the word parents, patriot, did it. And I missed it. And I said, after careful review, and I guess I wasn't careful enough. But I asked in my brief, when did the equitable adoption occur? At what point in time did it occur? What's the prima facie elements so we know what an equitable adoption is? He never responded. There are no prima facie elements. If you can have an equitable adoption in Illinois, and it's conferred by Mickey, can Mickey then say, I've changed my mind? Why not? If she could make up her mind to let you adopt the child, could she make up her mind to not let you adopt the child? Equitable parent, excuse me, equitable adopt, going back to equitable adoption for a second. There were two cases they cited. And if you read my brief, I was somewhat livid by the fact that they completely miscited the cases. The words equitable adoption don't even appear in the cases. I mean, I understand trying to reach out for your client. But you can't miscite cases to the appellate court and say they stand for the proposition that Illinois has long recognized equitable adoption for the purposes of inheritance. Those were all contract-based cases. And then we go to the Staley case, a case I actually helped write the brief when I was in law school for Mr. Heldrich. All of these cases are against them. So what they invite you to do is to adopt, no pun intended, the theory of equitable parent or to adopt the theory of equitable adoption. I ask you to respectfully decline that invitation. If anyone is going to create an expansion of what the word parent is and who has standing, it's the legislature. And while counsel and I cited the CBL case, knowing that it was between a same-sex couple, but they used the word parent. Counsel today cited from that case, yet in his reply brief, he said he was distinguishing the CBL case, but today he likes it. So I'm not sure which it is. But if you look at the case, even Judge Katz found it to be mostly dispositive. There is no legal standing if you're not a parent. And that's what it all comes down to. I think it's not my place to make light of this. I'm not trying to make light of the predicament that Mr. Ganser finds himself in today. But it's hard when he doesn't have any facts. There are no indisputable facts but two, as I've told you. And when he tells you that she made these statements, for example, the child's first words were da-da. No. Mom found an affidavit saying it's baba. Really, what's the difference with the child's first? That doesn't go to standing. He wants you to jump over the issue of standing, forget about standing, forget about all the Illinois case law, forget about the statute, and can we just talk about your hearts and my hearts? Don't we want to help the child? This is nothing short of inspired speculation. To say that the child, I mean, really, that the child sits behind a glass cage and watches his brother come and go, where does this come from? That he sat in my office and cried. I don't doubt that he cried. And he should cry. And he should be kicking himself in the butt every day because he had all this time to do what he had to do. It's called priorities. And he never did it. And to say that my client cages a child in glass and that this child will be emotionally damaged, one doesn't know. Nikki may allow someone else to adopt the child. Nikki may get remarried. The child may grow up to be strong, healthy, may be on the appellate court someday. We can't predict that future. But counsel wants you to engage in this inspired speculation because he wants to tug at all your heartstrings. And I believe in equity. But this isn't an equitable issue today. This is whether or not you have standing. And if it's a de novo issue, then you have to decide it on the law. And if you want to help Mr. Ganser, send him to the legislature. I raised two issues in my brief. And as I stand before you today, I have no answers. I thought in the reply brief I would get an answer. I did not. I thought maybe today Mr. Eichner for once would tell us the answer to my questions. He did not. So before I sit down, I ask you once again, maybe you'll ask him two questions. If completing an adoption is trivial or a ministerial act or a hyper-technicality, then why did you If you could find time to complete the adoption of Henry during the same time period, then why didn't you complete the adoption for William? Maybe today when my opposing counsel steps back up, he might answer those questions. But it all points back to the same thing. It is Mr. Ganser who didn't do this. And what he has done now in an attempt really to overwhelm, literally, financially meet my client in submission is to spend thousands upon thousands upon thousands of dollars of legal fees to establish something he could have done very simply, but he chose or failed to do it. And again, as I said, I could have done my entire argument in five lines. But I didn't, unless somebody asked me to. All right, thank you, counsel. Thank you. Thank you. I probably should have ended by saying we ask that you affirm the decision of the trial court. Thank you. Thank you. Your Honors, we're now talking about the sale of a car or the sale of a house or Star Wars. This is the most grave, important decision that I've ever been involved in in 32 years of practicing law. It's a decision that implicates the central public policy of the state of Illinois. And you've heard an argument for 20 minutes by opposing counsel, who I respect, but did not tell you one factual reason, one reason under this entire world, other than the fact that my client did not complete the ministerial step, why he should not be the father of this child, why he should not be considered or was or is the parent of this child. Because there is no reason. You still have to answer the question, why should we change the law for one individual? You're not changing the law for one individual, Judge. Counsel, I disagree with you. I understand that, Judge. Any time the court adopts and uses an equitable, or why should you do it in this case, Judge? I don't believe you're changing the law. You're using methodologies of parents. Patria, that's established in the law from the common law in England. You're using the doctrine of equitable estoppel, which finds its genesis in 15th century England. You're using the equitable adoption, which is a concept that is in Illinois law. And yes, I'm asking you to revisit, my client is, the equitable parent doctrine, which would, under the American Law Institute and other jurisdictions that have adopted this case, would fall squarely within it. I'm not asking you to change the law. I'm asking you to use tools available to you in current law to reach a result that is the only right result in this case. This isn't the sale of a car. Mr. Mirabelli said, the most important thing is the child. Well, the most important thing in this case is those two children. It's not Nicholas, and it's not Mickey. And Nicholas is a victim, but he's not the victim in this. The true victims of this outrage, of this conduct, are the two children. And they're the ones that have nobody arguing for them, and who rely on each of your honors, and the circuit court, and the state of Illinois to protect their interests. And I'm asking you to do that. In this case, you have the tools available to you. Other states have done it innumerably. Your honors have done it in Zwerin. And Roberts doesn't foreclose it. Simmons doesn't foreclose it. Equitable estoppel. The AJ versus Randy case in Wisconsin, applying equitable estoppel, which is a common law principle, which is not something that is unique or different in any state. It has the same elements. In that case, the doctrine of equitable estoppel has stopped the natural father from attempting to rebut the presumption that a child born during the marriage, that a husband whose child had been born during the marriage but was not the biological father, to rebut the presumption that he was not the father. In essence, conferring standing on a non-biological father in that case, you can do it in this case. Because nobody really talks about what is standing. We talk about standing as the right to sue. That's like a synonym. What is the definition of standing? The definition of standing is a person who has a direct, immediate interest in litigation that is neither remote or inconsequential. That's the definition of standing. And under that definition, under any stretch of the imagination, Nicholas Ganser has a direct and immediate interest in the subject of this litigation. He's a party to it. And he has an interest in how his child, Henry, and his child, William, are raised, who their custody, who their visitation is. And this court impinges itself in the trial courts, not this court, but divorce courts every day on when you can call your child, when the child should be bathed, what school the child should go to, where you pick up in the driveway. The courts impinge on a parent's rights to make those decisions. It certainly could impinge on it, consistent with public policy, to give the child's parent, father, an opportunity to seek, to visit, or to have custody with the child. The law is replete with situations where the court de facto situations are recognized. Illinois law allows for the termination of maintenance when there is a de facto husband and wife relationship, not married, but a de facto husband and wife relationship. Where is that in the statute, necessarily? Where was that in the common law? If we can do a de facto relationship to terminate maintenance, can we find him an equitable parent to allow these two children to have complete lives with fathers? You're going to have three children, two with fathers, and the middle one without a father. Now, I don't have to be a psychologist, a 604B, or a 215A expert to make the determination that that is not healthy for the child. Your Honor, if I may just quote from a case which I think is directly on point. In this case, and I did not cite the MB case they're referring to, I was referring to a case out of state. And I wasn't referring to this as they had a contract. I was only pointing out that in the law, sometimes the exact formalities need not be followed to reach a result. And I cite those in my brief, where people are married even though the technicalities of the marriage are not observed. And those are cited in my reply brief. And the state has an interest here which outweighs her interest, and nobody's talked about this, in parenting this child. And this is from a case, VC versus MJB. It's a 2000 case from New Jersey, 748 ASEC and 539. What we have addressed here is a specific set of circumstances involving the volitional choice of a legal parent to cede a measure of parental authority to a third party, to allow that party to function as a parent in the day-to-day life of the child, and to foster the forging of a parental bond between the third party and the child. In such circumstances, the legal parent has created a family with the third party and the child, and has invited the third party into the otherwise inviolable realm of family privacy. By virtue of her own actions, the legal parent's expectation of autonomous privacy in her relationship with her child is necessarily reduced from that which would have been the case had she never invited the third party into their lives. Most important, where that invitation and its consequences have altered her child's life by essentially giving him or her another parent, the legal parent's options are constrained. It is the child's best interest that is preeminent, as it would be if two legal parents were in a conflict over custody and visitation. And that involved the same-sex relationship that had the relationship not a husband-wife and not somebody who would raise the child from the minute they were born. There is not one case that presents a better fact pattern, a more compelling case, than this case. In any case, in any jurisdiction in Illinois, in the Zwerin case, for this court to recognize that Nicholas should be allowed the right, the standing, because he has a substantial interest in the subject matter of this litigation, to attempt to seek custody or visitation or see his child. And this implicates Henry as well, because again, it does not take a 604B expert. Everybody here is a parent that when he goes to the door to pick up Henry and he can't pick up William, and William knows that Henry's gone. And when Henry comes back and when they're seven or eight years old, that's going to happen. And I use the analogy behind a glass wall. It's like at the zoo. You can see him, but you can't hear or talk to him. And you can't touch him, and you can't take him. And if that is not devastating to a child, devastating to the child's brother, causing the potential of emotional harm to the child, and something this court should not allow happen absent compelling circumstances, then I don't know what is, Judge. This is the right thing to do. St. Paul said that the letter of the law kills. The spirit of the law gives life. Give life to this relationship with the spirit of the law as evinced in the public policy of this state. Let William have a father, and let Henry have a brother who has the same father as him. Thank you very much. Thank you, counsel. And thank both of you. You probably have represented your client about as best as anybody could, and probably the most emotional arguments I've seen in a long time. So thank you both.